Joe Angelo (Bar #268542)
jangelo@gajplaw.com
Gale, Angelo, Johnson, & Patrick, P.C.
1430 Blue Oaks Blvd., Ste. 250
Roseville, CA 95747
916-290-7778 ph
916-721-2767 fax

Attorneys for Plaintiff
George Nichols

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| George Nichols<br><br>Plaintiff,<br><br>v.<br><br>Experian Information Solutions, Inc.; Equifax Information Services, LLC; TransUnion, LLC; Freedom Mortgage Corporation; Homepoint Financial Corporation<br><br>Defendants. | CASE NO. 2:23-cv-0<br><br>COMPLAINT FOR DAMAGES:<br><br>1. Violation of Fair Credit Reporting Act; |

COMES NOW Plaintiff George Nichols (hereinafter "Plaintiff"), an individual, based on information and belief, to allege as follows:

**INTRODUCTION**

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. § 1681i(a)(4)), and 15 U.S.C. §1681i(a)(5)(A)).

2. Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's mortgage accounts with Freedom Mortgage Corporation (hereinafter "Freedom") and Homepoint Financial Corporation (hereinafter "Homepoint").

3. Freedom is not reporting Plaintiff's timely mortgage payments that are being timely made on the account, instead reporting that Plaintiff is not making timely payments.

4. In addition, Homepoint never updated Plaintiff's mortgage tradeline to reflect the transfer of the account and instead is reporting that the account is included/discharged in bankruptcy.

5. Plaintiff's chapter 13 bankruptcy proceeding did not discharge any of his mortgage obligations, rendering the reporting Homepoint as inaccurate and misleading.

6. To the extent that Homepoint transferred or sold the mortgage account, there is no update or ability for anyone to effectively "trace" the mortgages.

7. As a result, instead of accurately reporting the mortgage accounts as closed/transferred and indicating the party that is currently servicing Plaintiff's mortgage(s), Homepoint's reporting implies that Plaintiff discharged his mortgage liability, which is incorrect and leads to the inaccurate and incomplete reporting that currently appears on Plaintiff's credit report.

8. In addition, Plaintiff is current with his mortgage payments to Freedom, however Freedom is not reporting any of those timely payments, making it appear that Plaintiff is delinquent in his obligation to Freedom.

9. Such reporting is wholly inaccurate, misleading, and adversely impacts Plaintiff's credit worthiness.

10. Plaintiff's credit score has been adversely impacted by the reporting; he has been unable to rebuild his credit score and obtain favorable interest rates.

11. Third parties have been exposed to the inaccurate and misleading tradelines identified herein.

12. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.

## JURISDICTION & VENUE

13. Plaintiff re-alleges and incorporates herein by reference the allegations in each and every paragraph above, fully set forth herein.

14. The Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681.

15. The venue is proper pursuant to 28 U.S.C. §1391(b)(1).

## **GENERAL ALLEGATIONS**

16. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for accurate credit reporting in an attempt to purposefully undermine Plaintiff's attempt to improve his FICO Score.

17. In the alternative Plaintiff alleges that each and every Defendant's actions was the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### **FICO, Inc.**

18. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

19. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

20. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

21. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

22. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

23. There are 28 FICO Scores that are commonly used by lenders.

24. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

25. The three largest CRAs are Experian Information Solutions, Inc.; Equifax Information Services, LLC, and Transunion, LLC.

26. FICO does not control what information is provided in a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.
27. There are five key factors that a FICO Score considers: 1) Payment History 2) Amount of Debt 3) Length of Credit History 4) New Credit and 5) Credit Mix.
28. Each of the five factors is weighed differently by FICO.
29. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.
30. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score.  Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.
31. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently they occurred, and how many delinquent accounts exist.
32. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.
33. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.
34. A consumer's FICO score is negatively impacted when an adverse authorized user account is reported.

**Metro 2**

35. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.
36. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format.  The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt.  Specifically, Metro 2 format was designed to

allow reporting of the most accurate and complete information on consumer's credit history.

37. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

38. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

39. The CDIA is *the* expert on accurate credit reporting. In support of his allegations Plaintiff avers the following:
    a. The CDIA offers a FCRA certificate program for all CRAs.
    b. The CDIA offers a FCRA awareness program for all CRAs.
    c. The CDIA offers a FCRA Certificate program for DFs.
    d. The CDIA offers a FCRA awareness program for DFs.
    e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.
    f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.
    g. The CDIA developed a credit reporting resource guide for accurately reporting credit.

40. The CDIA's Metro 2 is accepted by all CRAs.
41. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).
42. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.
43. The three main credit bureaus helped draft the CRRG.
44. The CRRG is not readily available to the public. It can be purchased online for $229.45.
45. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

46. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.
47. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.
48. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results.  If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**Transferring accounts**

49. A consumer's account(s) should tell a story and should have a beginning, middle, and an end.
50. When creditors improperly transfer accounts, a consumer's account story becomes disorganized, confusing, and as in Plaintiff's case, results in a consumer being incorrectly labeled less credit worthy because Plaintiff's payment history becomes incomplete and would be flagged by any automated underwriting software for incomplete payment history.
51. The CRRG's guidelines for transferring or selling accounts is simple but rarely followed.
52. There are two contemplated ways in which an account can be sold or transferred.
53. The first way results in a single trade line existing post-transfer, while the second way results in two tradelines appearing that contain an account's entire history i.e. traceability.
54. The preferred method, and most accurate way in which an account can be transferred or sold, is to simply convert / transfer all of the account history to the new servicer or owner.
55. Thereafter the original trade line is replaced with a new single tradeline with a new account number and new creditor listed but with all of the original servicer/owner's account history reported.
56. The second contemplated transfer method results in two trade lines.  The original tradeline will report all of the account history up until the transfer/sale and the new account will pick up where the last account stopped.  The original creditor must list who the new servicer/owner is and the new creditor must list the original creditor on the new trade line.  Such reporting makes the debt traceable and allows future lenders a full and complete picture (story) of an account's history.

57. The CRRG does not contemplate, suggest, or otherwise imply a hypothetical outside of the two examples provided herein.
58. Specifically, the CRRG does not contemplate a situation where accounts are simply transferred without all information being converted into a new account or a second traceable tradeline appears on a consumer's credit report.
59. The CRRG is clear that the parties involved in the transfer or sale of accounts need to communicate to ensure accurate and complete reporting.

### e-OSCAR

60. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax, Inc.; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.
61. When a consumer sends a dispute letter to a CRA the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.
62. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

### Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator

63. When a consumer files for bankruptcy certain credit reporting industry standards exist.
64. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.
65. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.
66. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.
67. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.
68. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.
69. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered.  This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting

alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.

70. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.
71. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.
72. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.
73. The CII Metro 2 Code "Q" is used for mortgage accounts that were not included/discharged in bankruptcy and were otherwise not affected by the chapter 13 plan.
74. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.
75. The lack of a reported CII makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.
76. The lack of a CII reported also suggests that creditors are free to collect against a consumer as an individual or that no stay exists to prevent *in personam* collection activity.
77. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.
78. Under the Fair Credit Reporting Act a bankruptcy can be reported for ten years.
79. The ten-year rule for reporting runs from the date the bankruptcy was *filed.*
80. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.
81. The more time that has passed since the filing of the bankruptcy, the less negative impact the bankruptcy will have on a consumer's FICO Score.
    Failure to reference the bankruptcy filing (CII field) and or the correct petition date shall result in a lower FICO Score resulting in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

    **Plaintiff's Bankruptcy**
82. Plaintiff filed for Chapter 13 bankruptcy protection on December 20, 2019 in order to reorganize his finances and improve Plaintiff's credit worthiness and FICO score.

83. Plaintiff completed the terms of his chapter 13 plan and received a discharge of those debt provided for in his chapter 13 plan on April 21, 2023.
84. After completion of his bankruptcy Plaintiff ordered a credit report from Experian, Equifax, and TransUnion to ensure property reporting by Plaintiff's creditors after completion of her chapter 13 proceeding.
85. Plaintiff noticed tradelines from Freedom and Homepoint on her post-bankruptcy credit report that contained inaccurate, misleading, and incomplete information regarding Plaintiff's accounts with those respective lenders.
86. In response, Plaintiff disputed the inaccurate Freedom and Homepoint tradelines via certified mail with Experian, Equifax and TransUnion in May of 2023.
87. Plaintiff's dispute letter specifically put Freedom and Homepoint on notice that Plaintiff's chapter 13 plan did not provide for those claims or otherwise include/discharge the accounts in his chapter 13 proceeding.
88. To the extent the mortgage account(s) were transferred, Plaintiff's dispute letters requested that the tradelines be updated in order to disclose accurate information regarding the transfer(s).
89. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter, and in response, sent Plaintiff's dispute to Freedom and Homepoint via an ACDV through e-OSCAR.
90. On July 7, 2023, after the statutory time period had passed for Plaintiff to receive a reinvestigation report from the CRAs, Plaintiff ordered a second credit report from Experian, Equifax, and TransUnion for the sole purpose of ensuring Plaintiff's accounts with Freedom and Homepoint had been properly updated.
91. The Freedom and Homepoint accounts on Plaintiff's Experian, TransUnion, and Equifax reports still contained inaccurate and misleading account information.

**Inaccuracy – Freedom and Homepoint**

92. Plaintiff was frustrated to see that Defendants Freedom and Homepoint all did not properly update the accounts.
93. Defendant Freedom did not update the payment history on the account to indicate that Plaintiff was timely making his mortgage payments.

94. Defendant Homepoint was still reporting the account as closed and included and/or discharged in bankruptcy despite the account not being included or discharged in Plaintiff's Chapter 13 bankruptcy.

95. Homepoint's reporting of the mortgage accounts is inaccurate because Plaintiff did not include or seek to discharge her mortgage in her bankruptcy filing.

96. Both Freedom and Homepoint's reporting of Plaintiff's mortgage account is entirely incomplete, misleading and technically inaccurate.

97. The reporting is incomplete because the report lacks any updates on the Homepoint account, including reflecting that the account was not discharged and is not still subject to any type of bankruptcy proceeding.

98. Freedom should have updated the payment history on the account to indicate that all mortgage payments were timely made by Plaintiff.

99. Defendant Homepoint should have updated the CII to report a "Q" as instructed by the CRRG after Plaintiff completed her chapter 13 plan or at least removed the bankruptcy notations.

100. As it stands it appears that Defendant Homepoint continue to report the CII "D" making it appear that Plaintiff continues to be in an active bankruptcy and that the account(s) may or may not be subject to Plaintiff's discharge given that such a discharge has been received.

101. To be clear, it is impossible for accuracy purposes for Defendant Homepoint to accurately report a CII "D" post-discharge and after the completion of a Chapter 13 Plan as the CII "D" should only be reported during an active bankruptcy.

102. Plaintiff is no longer in bankruptcy and the accounts at issue were: 1) not discharged per the CRRG and the bankruptcy code, and 2) not currently in bankruptcy. As a result, Defendant Homepoint all should know that the CII "D" cannot possibly be accurate.

103. Plaintiff believes that Defendant Homepoint received a copy of Plaintiff's dispute and confirmed that the account was included and/or discharged in bankruptcy.

104. Further, Freedom is aware that Plaintiff is making timely payments on the mortgage account yet is failing to provide verification to the credit reporting agencies that the account is current with a complete and accurate payment history.

105. To the extent that Defendant Homepoint transferred Plaintiff's account, the account was transferred without following proper transferring procedures, which results in various misleading and incomplete tradelines on Plaintiff's credit reports.

**Willfulness**

106. Defendant Homepoint had actual knowledge of Plaintiff's chapter 13 plan and treatment of the mortgage accounts yet ignored such treatment and continued to report the accounts as included/discharged in bankruptcy.

107. Further, Defendant Freedom is aware that Plaintiff is current with his mortgage yet ignored Plaintiff's dispute and continued to report inaccurate information regarding the payment history of the account.

108. This was not a negligent act by Defendants Freedom and Homepoint but instead an intentional act to purposefully undermine Plaintiff's ability to effectively restore Plaintiff's credit through bankruptcy.

109. Defendant Homepoint is not following industry standards and is not listing the correct consumer information indicator (CII) as the CII should be updated to an "Q" as Plaintiff's bankruptcy has been discharged.

110. By notating the CII-Q potential lenders are alerted to the fact that the mortgage account(s) have not been included/discharged in bankruptcy and Plaintiff is not otherwise delinquent on her financial obligations with respect to her mortgage.

111. Once Defendants Freedom and Homepoint received Plaintiff's dispute, rather than acknowledge that the account(s) were not subject to / provided for in Plaintiff's chapter 13 filing, Defendants Freedom and Homepoint continued to report the account(s) as if all were included/discharged in bankruptcy and without updating the payment history to indicate that timely payments are being made on the account.

**Damages**

112. As a result of the incorrect reporting, Plaintiff has suffered economic loss, diminished credit, and emotional harm.
113. In addition, Plaintiff's fresh start has been irreparably harmed and continues to be harmed by the reporting of Defendants Freedom and Homepoint's tradelines as that reporting has been disclosed and disseminated to various third-party lenders.
114. Until Defendants Freedom and Homepoint's reporting has been properly updated Plaintiff continues to appear a severe credit risk.
115. The actions of Experian, Equifax, TransUnion, Freedom, and Homepoint, as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

## FIRST CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants)

**Experian, TransUnion, and Equifax – Failure to Assure Credit Reporting Accuracy**

116. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.
117. Experian, TransUnion, and Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files it published and maintained concerning Plaintiff.
118. Had Experian, TransUnion, and Equifax maintained reasonable procedures to assure maximum accuracy Experian, TransUnion, and Equifax would never have allowed Defendants Freedom and Homepoint to report the account as described herein.
119. As a result of Experian, TransUnion, and Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

### Willfulness

120. The violations described herein by Experian, TransUnion, and Equifax were willful, specifically the Credit Bureaus have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.

121. Experian, TransUnion, and Equifax intentionally send consumer disputes to employees who do not live within the continental United States.

122. This is done intentionally to hide and or subvert a consumer's ability to confront individuals directly responsible for approving accurate reporting.

123. These employees for Defendants Experian, TransUnion, and Equifax receive little to know training concerning how to accurately report consumer debt.

124. Instead, these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate. *See Saez v. Trans Union,* LLC, 621 F.Supp. 2d 1074, 1083, 1088 (D. Or. 2007); *Grigoryan v. Experian Info. Sols.*, Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols.*, No. CV 14-05276-AB (ASX)

125. Experian, TransUnion, and Equifax employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.

126. Experian, TransUnion, and Equifax have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

127. Experian, TransUnion, and Equifax also allowed Defendants Freedom and Homepoint to report the accounts as included/discharged in bankruptcy and report incomplete payment history despite being told why (and provided with verification) the reporting was inaccurate.

128. Given that Experian, TransUnion, and Equifax all helped draft the CRRG, and Plaintiff specifically referenced industry guidelines in the dispute letter Experian, TransUnion, and Equifax knew that the Freedom and Homepoint accounts were not reporting in a manner consistent with industry standards i.e. accurate, but chose to do nothing.

129. Consequently, Defendants Experian, TransUnion, and Equifax are liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Experian, TransUnion, and Equifax were at least negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

130. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, TransUnion, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### SECOND CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against Defendants)

**Freedom and Homepoint – Failure to Reinvestigate.**

131. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

132. 15 U.S.C. §§ 1681s-2(b) and 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

133. Defendants Freedom and Homepoint violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

134. The CRAs provided notice to Defendants Freedom and Homepoint that Plaintiff was disputing the inaccurate and misleading information, but Defendants Freedom and Homepoint failed to conduct a reasonable investigation of the information.

135. Based on Plaintiff's dispute, Defendants Freedom and Homepoint should have known the reporting of the mortgage account(s) as included/discharged in bankruptcy was inaccurate and that a failure to provide up to date and accurate payment history on the account was misleading.

136. The most basic investigation would include a simple review of well-established credit reporting industry standards.

137. Plaintiff alleges Defendants Freedom and Homepoint did not review well established industry standards for credit reporting.

138. If Defendants Freedom and Homepoint had reviewed such standards Defendants Freedom and Homepoint would have seen its reporting was not in compliance and consequently inaccurate and or incomplete.

139. Such an investigation would be unreasonable.

140. Plaintiff also alleges that Defendants Freedom and Homepoint did not investigate whether its claims were provided for through Plaintiff's chapter 13 plan and whether the appropriate updates were made with respect to any account transfers that may have occurred.

141. The lack of investigation is unreasonable.

142. Plaintiff further alleges that Defendants Freedom and Homepoint have not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and as such have developed reckless policies and procedures.

**Equifax, TransUnion, and Experian – Failure to Reinvestigate Disputed Information.**

143. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

144. After Plaintiff disputed the accounts mentioned above, Experian, TransUnion, and Equifax were required to conduct a reasonable investigation and to delete any information that was not accurate under 15 U.S.C. § 1681i-(a)1.

145. Experian, TransUnion, and Equifax failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.

146. Plaintiff alleges that Experian, TransUnion, and Equifax have its own independent duty to conduct a reasonable investigation 15 U.S.C. § 1681i-(a)1.

147. Experian, TransUnion, and Equifax are not passive entities bound to report whatever information a data furnisher, such as Defendants, provides.

148. Plaintiff alleges that Experian, TransUnion, and Equifax are readily familiar with Metro 2 guidelines and credit reporting industry standards given that Experian, TransUnion, and Equifax helped draft said guidelines.

149. Given the aforementioned, Plaintiff alleges that Experian, TransUnion, and Equifax can and do suppress inaccurate information from being reported when DFs provide inaccurate information.

150. Experian, TransUnion, and Equifax can and do instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

151. Experian, TransUnion, and Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that certain DFs were not following credit reporting industry standards.

152. Experian, TransUnion, and Equifax therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

153. Experian, TransUnion, and Equifax intentionally, willfully or with reckless disregard for Plaintiff's accuracy did no investigation whatsoever given that Experian and Equifax's general policy is to simply parrot whatever information a data-furnishers sends.

154. Such policy and procedure inherently leads to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

## THIRD CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against Defendants)

**Experian, TransUnion, and Equifax – Failure to Review and Consider All Relevant Information.**

155. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

156. Experian, TransUnion, and Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

157. As a result of Experian, TransUnion, and Equifax's violations of 15 U.S.C. § 1681i(a)(4), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

158. The violations by Experian, TransUnion, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

159. In the alternative, Experian, TransUnion, and Equifax were negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

160. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, TransUnion, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

### FOURTH CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
Against Defendants)

**Experian, TransUnion, and Equifax – Failure to Delete Disputed and Inaccurate Information.**

161. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

162. Experian, TransUnion, and Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

163. As a result of Experian, TransUnion, and Equifax's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

164. The violations by Experian, TransUnion, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

165. In the alternative, Experian, TransUnion, and Equifax were negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

166. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, TransUnion, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff hereby demands a trial by jury for all issues of fact triable by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;
2. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;
3. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o;
4. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and
5. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Dated: November 1, 2023

**Gale, Angelo, Johnson, & Patrick, P.C.**
*/s/ Joe Angelo*
Joe Angelo
Attorneys for Plaintiff